# NOS. 12-23-00296-CV
## 12-23-00307-CV

# IN THE COURT OF APPEALS

# TWELFTH COURT OF APPEALS DISTRICT

# TYLER, TEXAS

| | | |
|---|---|---|
| *IN RE:* | § | |
| *WILLIAM W. GOTHARD, JR., AND INSTITUTE IN BASIC LIFE PRINCIPLES, INC.* | § | *ORIGINAL PROCEEDING* |
| | § | |
| *RELATORS* | | |

## *MEMORANDUM OPINION*

Relator William W. Gothard, Jr. and Relator Institute in Basic Life Principles, Inc. (IBLP) each filed an original proceeding to challenge the denial of their respective Rule 91a motions to dismiss.[1]  We deny the writs.

### BACKGROUND

Real Parties in Interest Phoebe Merritt and Abigail Doty (RPIs) sued their father Stanley Grant, their brother Samuel Grant, the International A.L.E.R.T. Academy (A.L.E.R.T.), Gothard, and IBLP.[2]  RPIs allege assault and false imprisonment against the Grants, negligence against Stanley, and civil conspiracy against the Grants, Gothard, A.L.E.R.T., and IBLP.  They allege that they suffered sexual abuse from approximately 1996 through 2011, Doty by Stanley and Merritt by Stanley and Samuel.

---

[1] Respondent is the Honorable Jerald (Dean) Fowler, II, Judge of the 115th District Court in Upshur County, Texas.

[2] The Grants and A.L.E.R.T. are not parties to this original proceeding.  Because Stanley Grant and Samuel Grant share a surname, we refer to them by their first names for clarity and brevity.

According to RPIs, Gothard founded IBLP, which constitutes a "cult" that "holds and teaches distorted and heretical Christian doctrines." RPIs allege that Relators created a homeschooling program (the Advanced Training Institute or ATI) and A.L.E.R.T., a paramilitary training program for young males. RPIs maintain that Gothard and IBLP used ATI to indoctrinate children and (1) groom girls and young women to be readily available, compliant victims of sexual assault by male authorities, including the victims' fathers and brothers and (2) plan and facilitate the "cover-up of these crimes and torts." They allege that A.L.E.R.T. "indoctrinated boys and young men into the Gothard/IBLP sex abuse cult, teaching them to abuse and to overlook abuse."

Gothard and IBLP each filed a Rule 91a motion to dismiss the civil conspiracy cause of action. Respondent denied the motions on October 27, 2023. These proceedings followed. Because the proceedings constitute companion cases, we address them together.

## PREREQUISITES TO MANDAMUS

Mandamus is an extraordinary remedy. *In re Sw. Bell Tel. Co., L.P.*, 235 S.W.3d 619, 623 (Tex. 2007) (orig. proceeding). A writ of mandamus will issue only when the relator has no adequate remedy by appeal and the trial court committed a clear abuse of discretion. *In re Cerberus Capital Mgmt., L.P.*, 164 S.W.3d 379, 382 (Tex. 2005) (orig. proceeding). The relator has the burden of establishing both prerequisites. *In re Fitzgerald*, 429 S.W.3d 886, 891 (Tex. App.—Tyler 2014, orig. proceeding.). "Mandamus relief is appropriate when the trial court abuses its discretion in denying a Rule 91a motion to dismiss." *In re Farmers Tex. Cty. Mut. Ins. Co.*, 621 S.W.3d 261, 266 (Tex. 2021) (orig. proceeding); *In re McBride Operating, LLC*, No. 12-22-00279-CV, 2022 WL 17828401, at *2 (Tex. App.—Tyler Dec. 7, 2022, orig. proceeding) (mem. op.).

## ABUSE OF DISCRETION

Relators both contend that Respondent abused his discretion by refusing to dismiss RPIs' civil conspiracy claim against them pursuant to Texas Rule of Civil Procedure 91a.[3]

---

[3] RPIs maintain that Relators misused Rule 91a by (1) arguing that RPIs must provide evidence in support of their civil conspiracy claim, and (2) seeking to circumvent the rules for special exceptions and summary judgments. We agree that Rule 91a "is not a substitute for special exception practice under [R]ule 91 or summary

**Rule 91a Motions**

With certain exceptions inapplicable to this case, a "party may move to dismiss a cause of action on the grounds that it has no basis in law or fact." TEX. R. CIV. P. 91a.1; *In re First Reserve Mgmt., LP*, 671 S.W.3d 653, 659 (Tex. 2023) (orig. proceeding). "A cause of action has no basis in law if the allegations, taken as true, together with inferences reasonably drawn from them, do not entitle the claimant to the relief sought." TEX. R. CIV. P. 91a.1; *First Reserve*, 671 S.W.3d at 659. "[I]n assessing whether the non-movant's pleading has no basis in law, we apply a fair-notice pleading standard to determine whether the allegations of the petition are sufficient to allege a cause of action." *Davis v. Homeowners of Am. Ins. Co.*, No. 05-21-00092-CV, 2023 WL 3735115, at *3 (Tex. App.—Dallas May 31, 2023, no pet.) (mem. op.). There are typically two circumstances in which a court may determine that a cause of action has no basis in law: (1) the plaintiff fails to plead a legally cognizable cause of action, or (2) the allegations in the plaintiff's pleading establish a complete legal bar to the plaintiff's claims by affirmatively negating entitlement to the relief requested. *Id*. at *4; *Reaves v. City of Corpus Christi*, 518 S.W.3d 594, 609 (Tex. App.—Corpus Christi 2017, no pet.) ("a court reviewing a petition for a basis in law should evaluate whether the plaintiff has provided fair notice of a cognizable claim for relief and whether the petition alleges facts that, if true, bar recovery"). Additionally, "Rule 91a permits motions to dismiss based on affirmative defenses 'if the allegations, taken as true, together with inferences reasonably drawn from them, do not entitle the claimant to the relief sought.'" *Bethel v. Quilling, Selander, Lownds, Winslett & Moser, PC*, 595 S.W.3d 651, 656 (Tex. 2020) (quoting TEX. R. CIV. P. 91a.1).

"A cause of action has no basis in fact if no reasonable person could believe the facts pleaded." TEX. R. CIV. P. 91a.1; *First Reserve*, 671 S.W.3d at 659. In evaluating whether a cause of action has a basis in fact, we apply the Texas fair notice pleading standard, under which a petition is sufficient "if it gives fair and adequate notice of the facts upon which the pleader bases his claim." *Howard v. Pine Tree, ISD*, No. 12-22-00222-CV, 2023 WL 3157979, at *2 (Tex. App.—Tyler Apr. 28, 2023, pet. denied) (mem. op.) (quoting *Darnell v. Rogers*, 588 S.W.3d 295, 301 (Tex. App.—El Paso 2019, no pet.)). We assess the pleadings' sufficiency by

judgment practice under [R]ule 166a, both of which come with protective features against precipitate summary dispositions on the merits." *Davis v. Homeowners of Am. Ins. Co.*, No. 05-21-00092-CV, 2023 WL 3735115, at *2 (Tex. App.—Dallas May 31, 2023, no pet.) (mem. op.). Thus, in reviewing whether RPIs stated a claim for civil conspiracy, we will do so in accordance with Rule 91a standards.

3

determining whether the opposing party can ascertain the nature, basic issues, and type of evidence that might be relevant to the controversy. *Id*. If the petition provides sufficient facts to give fair notice of the plaintiff's claim, a motion seeking dismissal based on a lack of basis in fact should be denied. *Id*.

A Rule 91a motion must be based solely on the pleading of the cause of action, together with any pleading exhibits permitted by Rule 59.[4] TEX. R. CIV. P. 91a.6. "We review the merits of a Rule 91a ruling de novo; whether a defendant is entitled to dismissal under the facts alleged is a legal question." *Farmers*, 621 S.W.3d at 266. We construe pleadings liberally in favor of the plaintiff, look to the pleader's intent, and accept as true factual allegations in the pleadings to determine if the cause of action has a basis in law or fact. *McBride,* 2022 WL 17828401, at \*2. We apply the fair-notice pleading standard to determine whether a petition's allegations are sufficient to allege a cause of action. *Id*.

## Civil Conspiracy

To recover for civil conspiracy, a plaintiff must show "(1) a combination of two or more persons; (2) the persons seek to accomplish an object or course of action; (3) the persons reach a meeting of the minds on the object or course of action; (4) one or more unlawful, overt acts are taken in pursuance of the object or course of action; and (5) damages occur as a proximate result." *First United Pentecostal Church of Beaumont v. Parker*, 514 S.W.3d 214, 222 (Tex. 2017). "[A] defendant's liability for conspiracy depends on participation in some underlying tort for which the plaintiff seeks to hold at least one of the named defendants liable." *Tilton v. Marshall*, 925 S.W.2d 672, 681 (Tex. 1996). In other words, it is a derivative tort. *See Agar Corp., Inc. v. Electro Circuits Int'l, LLC*, 580 S.W.3d 136, 142 (Tex. 2019). An actionable civil conspiracy requires specific intent to agree to accomplish something unlawful or to accomplish something lawful by unlawful means. *Parker*, 514 S.W.3d at 222. This inherently requires a meeting of the minds on the object or course of action. *Id*. Thus, an actionable civil conspiracy exists only as to those parties who are aware of the intended harm or proposed wrongful conduct

---

[4] *See* TEX. R. CIV. P. 59 ("Notes, accounts, bonds, mortgages, records, and all other written instruments, constituting, in whole or in part, the claim sued on, or the matter set up in defense, may be made a part of the pleadings by copies thereof, or the originals, being attached or filed and referred to as such, or by copying the same in the body of the pleading in aid and explanation of the allegations in the petition or answer made in reference to said instruments and shall be deemed a part thereof for all purposes. Such pleadings shall not be deemed defective because of the lack of any allegations which can be supplied from said exhibit. No other instrument of writing shall be made an exhibit in the pleading.").

4

at the outset of the combination or agreement. *Id*. A civil conspiracy claim may be based on circumstantial evidence and reasonable inferences from parties' actions. *In re Lipsky*, 411 S.W.3d 530, 549 (Tex. App.—Fort Worth 2013, orig. proceeding).

*RPIs' Amended Petition*

At the time of Respondent's ruling, RPIs' first amended petition served as the live pleading.[5] RPIs allege that Stanley and their mother Susan (now deceased) became followers of IBLP, adopted IBLP's teachings (including corporal punishment), homeschooled their children using ATI materials, and attended camps at which IBLP's "principles of hierarchy, control, domination, and submission were taught and reinforced." Stanley and Samuel participated in A.L.E.R.T., with Samuel graduating from the A.L.E.R.T. academy. In addition to alleging that they were sexually assaulted at their home, RPIs allege that Doty was assaulted by Stanley at the home of two individuals, who were then leaders at the A.L.E.R.T. cadet program.

RPIs describe Relators' teachings as (1) encouraging followers to associate with only other followers, thereby isolating and controlling them, (2) controlling the flow and content of information, and the patterns of rewards and punishments, to followers, essentially erasing or minimizing followers' identities, (3) creating dependency and controlling followers' thoughts and actions, and (4) creating ideal victims for sexual assault through teachings on patriarchal authority and the corresponding duty owed by children. Such teachings include the following:

- "[E]veryone must obey the spoken and unspoken wishes of those in authority over them and [] it is grievous sin to fail to do so."

- "[H]usbands and fathers are the sole, absolute authority with complete control over wives and children."

- A wife must "comply, immediately and with docility, with her husband's commands and even his unspoken wishes," "children must obey their parents," "it is grave sin for children to argue or even to express any displeasure with any command he or she has been given," and "failure to submit to this authority structure is treated as a major dishonor of the father and a sin."

- "Parentification" is the "highly ritualized practice of enlisting older children, especially older daughters, in a large family to act as co-parents for the younger children … very young girls

---

[5] RPIs object to statements in Relators' mandamus petitions that they claim are not derived from the live petition. Because RPIs' first amended petition was the live pleading at the time of Respondent's ruling, we will consider that petition in our analysis. *See Fawcett v. Grosu*, 498 S.W.3d 650, 658 (Tex. App.—Houston [14th Dist.] 2016, pet. denied) ("amended petition adds to or withdraws from that which was previously pleaded to correct or to plead new matter, and completely replaces and supersedes the previous pleading").

5

effectively are treated as adults and not children … [and] … a father's relationship with his daughter is made more like his relationship with his wife than his relationship with his child."

- "Courtship," a dating alternative, places fathers, especially the girl's father, in control of the courtship. "[I]f a teenage or young adult male has normal desires for a romantic relationship with a girl or young woman, the couple must submit to the authority and commands" of the girl's father. "[F]athers and daughters are taught they must have an adequate closeness for the daughter to have a successful marriage later in life." Through this process, "IBLP intentionally and effectively sexualizes the father-daughter relationship."

- Followers must have as many children as possible.

- Females must wear "extreme conservative dress," which is part of a larger doctrine that "women who are sexually assaulted are at least as guilty as their assailant."

- A girl or young woman must never question anything her father does to her, including invasions of her body and must adequately cry out when sexually assaulted, or she is equally responsible as the attacker.

- Encouraging followers to conceal sexual abuse and prevent law enforcement from discovering or prosecuting sexual abuse.

- Teaching that law enforcement, including the Texas Department of Family and Protective Services, are "agents of Satan" and it is a "moral imperative to lie to law enforcement about allegations of abuse."

According to RPIs, IBLP recruited and created "a ready supply of submissive, young, female sex abuse victims" by teaching girls and young women that (1) "when they are sexually assaulted, they should be thankful because God will use the suffering to increase their spirituality," and (2) "reporting sexual assault or seeking to hold the attacker accountable were acts of disobedience and defiance directly to God." Furthermore, IBLP's teachings "became a blueprint for fathers and older brothers to sexually abuse their daughters and young sisters" and the "atmosphere of abuse and victim blaming advanced Gothard's personal goal of sexually abusing girls and young women with impunity."

RPIs allege Gothard "molded" IBLP "into a sex abuse conspiracy" through IBLP's teachings. They assert that (1) through IBLP, Gothard "created and led a conspiracy among his most zealous followers that directly led to harm, including the harm to [RPIs]," and (2) the conspiracy was intended to create and maintain conditions that facilitated and fostered sexual abuse of girls and young women and to conceal said abuse from law enforcement. A.L.E.R.T. constitutes one way in which RPIs maintain Relators furthered this conspiracy. According to RPIs, Relators created A.L.E.R.T. "as a vehicle to carry out the conspiracy and to indoctrinate boys and young men, including Defendant Samuel Grant, into the conspiracy" and A.L.E.R.T. was "central to the IBLP conspiracy," being a primary means by which Relators reinforced

"principles of hierarchy, control, domination, and submission." They state that boys and young men were taught to "'victim blame' female sexual abuse victims and to excuse their own sexual misconduct" and that IBLP "taught and promoted the physical, mental, and emotional subjugation of women and girls," essentially training girls to be victims and boys to be attackers. ATI is another means of indoctrination identified by RPIs. They assert ATI "groomed girls and young women to be readily available, compliant victims of sexual assault by male IBLP authorities, including the fathers and brothers of the victims," and "planned and facilitated the cover-up of these crimes and torts." As examples, they allege that (1) Gothard's brother was removed from his position with IBLP for sexual harassment and sexual relationships with female staffers, (2) Gothard was forced out of IBLP for sexually harassing and assaulting female staffers, including minors, and (3) in addition to the abuse committed against RPIs, one of their other sisters was sexually assaulted by Samuel and their other brother Luke, the brothers pleaded "guilty" to indecency with a child, and the assault "was carried out as part of and in furtherance of the same [] conspiracy of which Plaintiffs were victims." RPIs label Gothard a "serial sexual assaulter" who personally benefitted from a culture that recruited and groomed girls and young women to be victims of sexual assault, shamed female victims into silence, and excused male assaulters. They allege that Relators' actions "evolved from bad teaching to the active promotion of evil, including sexual abuse of girls and young women."

In asserting their civil conspiracy claim, RPIs allege that Relators, Samuel, Stanley, and A.L.E.R.T. "were all members of the civil conspiracy planned and devised by Gothard and implemented through IBLP," the objectives of which include:

> a. creating and maintaining conditions which facilitated and fostered the sexual abuse of young females by male family members;
>
> b. recruiting and procuring girls and young women for sexual abuse; and
>
> c. concealing such sexual abuse from law enforcement.

They allege that Relators, Samuel, Stanley, and A.L.E.R.T. "had a meeting of the minds on the objects to be accomplished, specifically the repeated and systematic sexual abuse of girls and young women and the concealment of such abuse." RPIs assert the following:

> …Gothard, A.L.E.R.T. and IBLP established the objects to be accomplished and courses of action to be pursued, implemented the courses of action, and provided instruction and training for co-conspirators in those courses of action. Stanley Grant and Samuel Grant joined the conspiracy after it had begun, agreed with Gothard, A.L.E.R.T. and IBLP on the objects to be achieved and

7

the courses of action to be pursued, received instruction and training in those courses of action, and committed tortious acts in furtherance of the conspiracy as pled above.

…Stanley Grant and Samuel Grant engaged in the following unlawful, overt acts in furtherance of the objects of the conspiracy:

      a. sexually assaulting Plaintiffs as pleaded above;
      b. negligently failing to protect Plaintiffs from sexual abuse as pleaded above; and
      c. concealing the sexual assaults as pleaded above.

RPIs allege (1) they suffered harm caused by one or more of the unlawful, overt acts engaged in by Stanley and Samuel in furtherance of the objects of the conspiracy and (2) that, as co-conspirators, Gothard, IBLP, and A.L.E.R.T. are jointly and severally liable for all damages caused by those unlawful, overt acts taken in furtherance of the conspiracy.

*Analysis*

Only IBLP challenges RPIs' claim as having no basis in fact. In its issues presented, however, IBLP questions whether there is any basis in law for the civil conspiracy claim and its petition appears centered on a challenge to the claim's basis in law. To the extent IBLP actually challenges whether civil conspiracy has a basis in fact, a claim lacks a "basis in fact if no reasonable person could believe the facts pleaded." Tex. R. Civ. P. 91a.1; ***First Reserve***, 671 S.W.3d at 659. But a review of RPIs' petition discloses no basis to conclude that a reasonable person could not believe the facts pleaded, and IBLP suggests none. *See **Davis***, 2023 WL 3735115, at *6 (trial court erred in granting motion to dismiss; original petition disclosed no basis to conclude that no reasonable person could believe facts pleaded, and movant suggested none). Accordingly, we cannot conclude that RPIs' civil conspiracy cause of action has no basis in fact with respect to IBLP.

Both Relators maintain that no basis in law supports RPIs' civil conspiracy claim. In doing so, Relators point to the absence of facts in RPIs' petition, namely, that (1) Gothard ever sexually abused RPIs, was present when any abuse occurred, was informed of the abuse, or personally met with Stanley and Samuel to plan sexual abuse and conceal sexual abuse, (2) any of IBLP's agents encouraged, agreed to, or were informed of the abuse or personally met or communicated with the Grants to plan or encourage sexual abuse and conceal it, (3) abuse ever occurred on IBLP's property, and (4) any materials support allegations that IBLP or Gothard ever advocated sexual abuse of females or concealment of said abuse. Relators emphasize RPIs' admissions that Stanley and Samuel were the perpetrators and that the abuse occurred at places

other than Gothard's home or IBLP's property. According to IBLP, RPIs make "the giant and legally unsustainable jump to conclude that there was a 'meeting of the minds on the objects to be accomplished, specifically repeated and systematic sexual abuse of girls and young women and the concealment of such abuse.'"

We first note that "civil conspiracy is a vicarious liability theory that imparts joint-and-several liability to a co-conspirator who *may not be liable for the underlying tort*." *Agar Corp.*, 580 S.W.3d at 140 (emphasis added); *see Tilton*, 925 S.W.2d. at 681 ("a defendant's liability for conspiracy depends on participation in some underlying tort for which the plaintiff seeks to hold at least one of the named defendants liable"). Accordingly, it matters not that Gothard never sexually abused RPIs or was never present during any abuse. Nor is it relevant that abuse never occurred on IBLP's property. Gothard and IBLP may still be held liable for civil conspiracy even without direct involvement in the underlying tort. *See Agar Corp.*, 580 S.W.3d at 140.

Moreover, "Rule 91a provides a harsh remedy and should be strictly construed." *Davis*, 2023 WL 3735115, at *2. To survive a Rule 91a dismissal, RPIs need not provide a fully developed pleading on the merits in which they marshal their evidence or provide comprehensive factual details regarding the incident giving rise to the lawsuit. *In re TPCO Am. Corp.*, No. 13-17-00294-CV, 2018 WL 1737075, at *6 (Tex. App.—Corpus Christi Apr. 11, 2018, orig. proceeding). Rather, as the Texas Supreme Court recently explained, allegations in a petition must "satisfy our notice-pleading rules, which require pleadings to not only give notice 'of the claim and the relief sought' but also of the essential factual allegations.'" *First Reserve*, 671 S.W.3d at 661-62 (quoting *Kinder Morgan SACROC, LP v. Scurry Cty.*, 622 S.W.3d 835, 849 (Tex. 2021). A "'cause of action' means the 'fact or facts entitling one to institute and maintain an action, which must be alleged and proved in order to obtain relief.'" *Id*. at 662 (quoting *Kinder Morgan*, 622 S.W.3d at 849 n.63). It is not enough for the plaintiff to provide fair notice of the claims alleged; rather, the "plaintiff must plead 'the essential factual allegations supporting those claims,' which must be sufficient to support a judgment if ultimately proven." *Id*. (emphasis added) (quoting *Kinder Morgan*, 622 S.W.3d at 849, 850-51). "Even the omission of an element is not fatal if the cause of action 'may be reasonably inferred from what is specifically stated.'" *Lipsky*, 411 S.W.3d at 590 (quoting *Boyles v. Kerr,* 855 S.W.2d 593, 601 (Tex.1993)). "Given the fact that we are reviewing a nascent lawsuit, it would be inappropriate to require a level of detail and clarity for the petition that might only be available after the case

9

has been developed through discovery and responsive pleadings." ***TPCO Am. Corp.***, 2018 WL 1737075, at \*6. RPIs were simply not required to present the level of factual detail that Relators apparently believe the petition must include.

Relators further take the position that RPIs' claim lacks a basis in law because they cite no authority "holding that the teaching and publication of religious materials used or read by members of the public can be a basis for a civil conspiracy to commit a tort." They cite ***In re Essex Insurance Company***, 450 S.W.3d 524 (Tex. 2014) (orig. proceeding) (per curiam) as support for this position. In ***Essex***, Rafael Zuniga sued San Diego Tortilla (SDT) for personal injury and added a declaratory judgment claim against Essex, SDT's liability insurer. ***Essex***, 450 S.W.3d at 525. The trial court denied Essex's motion to dismiss. ***Id***. The Texas Supreme Court noted the general rule that an injured party cannot sue a tortfeasor's insurer directly until the tortfeasor's liability has been finally determined by agreement or judgment. ***Id***. Although there are exceptions to the general rule, none applied. ***Id***. Texas law did not permit Zuniga to sue Essex directly for a declaration of Essex's duty to indemnify SDT before SDT's liability to Zuniga had been determined. ***Id***. at 527. And Zuniga cited no cases in which the Texas Supreme Court held that the plaintiff, who is not a party to the insurance policy, may seek or obtain a declaratory judgment regarding an insurer's duty to indemnify an insured defendant against liability to the plaintiff before that liability has been determined. ***Id***. Thus, the general rule applied, and dismissal was required. ***Id***. at 527-28.

We do not construe ***Essex*** as setting forth a bright line rule that a plaintiff must present legal authority to support pleaded claims in order to survive a Rule 91a motion to dismiss. As the Texas Supreme Court explained, a "cause of action has no basis in law under Rule 91a if it is barred by an *established legal rule* and the plaintiff has failed to plead facts demonstrating that the rule does not apply." ***First Reserve***, 671 S.W.3d at 661 (emphasis added). This is not a situation wherein an *established legal rule* bars RPIs' civil conspiracy claim as alleged. That there may be no legal authority directly on point or directly authorizing such a claim is not tantamount to the existence of an already established legal rule barring the claim.[6] *See generally*

---

[6] In ***First Reserve***, a Rule 91a dismissal case, plaintiffs sued TPC Group, the owner of a plant that exploded. ***In re First Reserve Mgmt., LP***, 671 S.W.3d 653, 656-57 (Tex. 2023) (orig. proceeding). Sawgrass Holdings, LP (of which Sawgrass Holdings GP is general partner) indirectly owned TPC and First Reserve, an investor group, was one of the owners of Sawgrass. ***Id***. at 657. Plaintiffs later amended their petition to add new defendants, including First Reserve. ***Id***. They alleged that the "investors [including First Reserve], through their control of four of the five seats on the GP Board, together with Sawgrass Holdings LP and Sawgrass Holdings GP,

*In re RNDC Tex., LLC*, No. 05-18-00555-CV, 2018 WL 2773262, at *1 (Tex. App.—Dallas June 11, 2018, orig. proceeding) (mem. op.) ("if nothing in the pleading itself triggers a clear legal bar to the claim, then there is a basis in law and the motion should be denied"); *see also Reaves*, 518 S.W.3d at 608 ("Dismissal is certainly appropriate when Texas has rejected the pleaded cause of action—or has rejected the viability of that action under the circumstances pleaded by the plaintiff").

Moreover, RPIs pleaded a legally cognizable cause of action – civil conspiracy – for which they set forth the essential factual allegations. Their amended petition alleges that two or more persons, including the Grants, IBLP, and Gothard, conspired to sexually abuse females and conceal that abuse. *See Parker*, 514 S.W.3d at 222. They state factually how RPIs did so – by creating and maintaining conditions that facilitated and fostered sexual abuse by male family members and recruiting and procuring girls and young women for sexual abuse. A reasonable inference can be drawn that RPIs allege Relators were aware of the unlawful result, being sexual assault, that this conduct would cause and specifically intended said result. Under a Rule 91a review, we are only concerned with whether RPIs' petition sufficiently provides fair notice of a cognizable claim for relief. *See Davis*, 2023 WL 3735115, at *3; *see also Reaves*, 518 S.W.3d at 609. We conclude that their petition does so; consequently, we cannot say that RPIs' allegations, taken as true and with inferences reasonably drawn therefrom, have no basis in law. *See* TEX. R. CIV. P. 91a.1. This fairly-noticed claim may yet be borne out by evidence of some "set of facts," which entitle them to relief. *Reaves*, 518 S.W.3d at 614. But whether RPIs will ultimately prevail or whether Relators may ultimately be victorious through some other procedural vehicle, such as summary judgment, is not before us at this stage of the proceeding. *See Davis*, 2023 WL

---

are responsible for TPC's failure to perform the needed turnaround and other maintenance that would have prevented the explosions." *Id*. First Reserve's Rule 91a motion to dismiss was denied. *Id*. at 658. Negligent undertaking was the tort at issue. *Id*. at 659. The Texas Supreme Court explained that liability could not be based on First Reserve's ownership interest in TPC, its appointments to the GP Board, or any other action consistent with its investor status; thus, the plaintiffs must have "pleaded facts showing that First Reserve undertook in other ways to run TPC's day-to-day operations and, specifically, to delay the turnaround that could have prevented the explosions." *Id*. at 661. But plaintiffs failed to "state factually *how* First Reserve itself took and exercised [] control other than through its ownership interest and the GP Board[.]" *Id*. at 663 (emphasis original). Plaintiffs stated, "When an 'owner' actively inserts itself into the day-to-day operational decisions of a company—and makes specific—and erroneous—operational decisions that blow up a plant—Court-manufactured immunity will not lie." *Id*. But the Supreme Court noted "Plaintiffs must have alleged facts to show *that is what First Reserve did*." *Id*. (emphasis added). Thus, the Supreme Court held that plaintiffs' "third amended petition makes many *legal accusations* but no *factual allegations* to show a cause of action with a basis in law against First Reserve for TPC's conduct." *Id*. (emphasis original).

3735115, at *2 (Rule 91a is not a substitute for summary judgment practice); *see also **Reaves**,* 518 S.W.3d at 614 ("rule 91a does not allow this Court to address anything other than an appellants' petition … or to assume anything other than the best of that petition").

**Constitutional Protections**

Relators each assert constitutional arguments as support for their contention that RPIs' civil conspiracy claim should have been dismissed. Gothard maintains that religious teachings and the publication thereof are constitutionally protected. IBLP contends the ecclesiastical abstention doctrine bars RPIs' cause of action.[7] It argues that the "alleged religiously motivated conduct of IBLP is the advocacy and publication of religious beliefs." According to Relators, if RPIs' claim is considered valid, any religious leader who speaks on religious topics and publishes his beliefs could be subject to a civil cause of action if a listener or reader improperly applies those beliefs in sexually abusing another person or committing some other unlawful act.

*Applicable Law*

The "ecclesiastical abstention doctrine recognizes that the Establishment Clause of the First Amendment precludes judicial review of claims that require resolution of 'strictly and purely ecclesiastical' questions." **McRaney v. N. Am. Mission Bd. of the S. Baptist Convention, Inc.**, 966 F.3d 346, 348 (5th Cir. 2020). The doctrine, grounded in the First Amendment, prohibits civil courts from delving into matters of "theological controversy, church discipline, ecclesiastical government, or the conformity of the members of the church to the standard of morals required of them." **In re Lubbock**, 624 S.W.3d 506, 508-09 (Tex. 2021) (orig. proceeding) (quoting **Serbian E. Orthodox Diocese v. Milivojevich**, 426 U.S. 696, 714, 96 S. Ct. 2372, 2382, 49 L.Ed.2d 151 (1976)). However, the Texas Supreme Court has held that "[w]hile Article I, Section 6 of the Texas Constitution and the First Amendment to the United States Constitution afford broad protection to the free exercise of religion, they *do not necessarily bar all claims which may touch on religious conduct*." **Tilton**, 925 S.W.2d at 677 (emphasis added). The commentary to Article I, Section 6 reinforces this principle:

---

[7] IBLP's motion to dismiss did not specifically use the words "ecclesiastical abstention doctrine," but relied on **Tilton** in asserting that the First Amendment bars RPIs' claim. In discussing the ecclesiastical abstention doctrine, the Texas Supreme Court cites **Tilton** and the First Amendment, and the analyses are consistent with and complement each other. *See In re Lubbock*, 624 S.W.3d 506 (Tex. 2021) (orig. proceeding); *see also Tilton v. Marshall*, 925 S.W.2d 672, 681 (Tex. 1996). Thus, IBLP's failure to use the exact phrasing does not preclude our review.

12

> ...the free exercise of religion does not go so far as to be inclusive of actions which are *in violation of social duties or subversive of good order*. Although freedom to believe may be said to be absolute, *freedom of conduct is not* and *conduct even under religious guise remains subject to regulation for the protection of society*. But conduct may be infringed or restricted by the state only to prevent grave and immediate dangers to interests of the state which the state may lawfully protect.

TEX. CONST. art. I, § 6 interp. commentary (emphasis added); *see **Tilton***, 925 S.W.2d at 677 (when plaintiff's suit implicates defendant's free exercise rights, defendant may assert First Amendment as affirmative defense). The "Free Exercise Clause never has immunized clergy or churches from all causes of action alleging tortious conduct." ***Id***. at 677. The free speech clause works in tandem with the free exercise clause: "[w]here the Free Exercise Clause protects religious exercises, whether communicative or not, the Free Speech Clause provides overlapping protection for expressive religious activities."[8] ***Kennedy v. Bremerton School Dist.***, 597 U.S. 507, 523, 142 S. Ct. 2407, 2421, 213 L. Ed.2d 755 (2022).

The Texas Supreme Court explained as follows:

> The First Amendment prohibits government—and courts—from interfering with a believer's ability to observe his faith and from interfering with a church's management of its internal affairs. Churches have a fundamental right under the First Amendment to decide for themselves, free from state interference, matters of church governance as well as those of faith and doctrine. It is a core tenet of the First Amendment that in resolving civil claims courts must be careful not to intrude upon internal affairs of church governance and autonomy. Autonomy extends to the rights of hierarchical religious bodies to establish their own internal rules and regulations and to create tribunals for adjudicating disputes over religious matters. And it extends to a church's conclusions regarding its own ecclesiastical rules, customs, and laws. Government action that interferes with this autonomy or risks judicial entanglement with a church's conclusions regarding its own rules, customs, or laws is therefore prohibited by the First Amendment.

***Lubbock***, 624 S.W.3d at 512-13 (internal citations omitted). But the First Amendment does not bar all claims against religious bodies. ***Id.*** at 513. A court may exercise jurisdiction over a controversy if it can apply neutral principles of law that will not require inquiry into religious doctrine, interference with the free-exercise rights of believers, or meddling in church government. ***Id***. Under this methodology, "courts decide non-ecclesiastical issues such as

---

[8] In its reply brief, IBLP presents substantial argument on the free speech clause and the elements of incitement, arguing that dismissal is warranted because the free speech defense applies. Although IBLP mentioned free speech in its motion to dismiss, it did not present this particular argument. Accordingly, we do not consider it. *See* TEX. R. APP. P. 33.1(a); *see also **In re Doyle***, No. 12-19-00317-CV, 2020 WL 219236, at *1 n.3 (Tex. App.—Tyler Jan. 15, 2020, orig. proceeding) (mem. op.) (declining to consider argument raised for first time in mandamus proceeding); ***In re Wade***, Nos. 14-18-00486-CV & 14-18-00187-CV, 2019 WL 3295093, at *4 (Tex. App.—Houston [14th Dist.] July 23, 2019, orig. proceeding) (mem. op.) (appellate rules did not allow relator to raise new issue not discussed in original brief, even if new issue was raised in response to matter in real party in interest's brief).

property ownership based on the same neutral principles of law applicable to other entities, while deferring to religious entities' decisions on ecclesiastical and church polity questions." *Id*. (quoting *Masterson v. Diocese of Nw. Tex.*, 422 S.W.3d 594, 596 (Tex. 2013) (internal citation omitted)). "[A]ny exception to ecclesiastical abstention by application of neutral principles must be narrowly drawn to avoid inhibiting the free exercise of religion or imposing secular interests on religious controversies." *Id*. "[C]ourts should consider not only whether a neutral principle exists without regard to religion, but also whether the application of neutral principles would impose civil liability upon a church for complying with its own internal rules and regulations or resolving a religious matter." *Id*. When determining whether the doctrine applies, courts analyze whether a particular dispute is ecclesiastical or merely a civil-law controversy in which the church happens to be involved. *Id*. at 514. In doing so, we look to the substance and nature of the plaintiff's claims. *Id*. Because courts are prohibited from risking judicial entanglement with ecclesiastical matters, if the substance and nature of the plaintiff's claims are inextricably intertwined with matters of doctrine or church governance, then the case must be dismissed. *Id*.

  *Analysis*

  We first address RPIs' argument that the ecclesiastical abstention doctrine does not apply to IBLP given IBLP's acknowledgment in its petition that it is "certainly not a church. It is a nonprofit corporation with no members and is governed by a Board of Directors." But in discussing the ecclesiastical abstention doctrine, the Texas Supreme Court not only referred to churches, but also to "religious bodies." *See generally id*. at 513 ("Autonomy extends to the rights of hierarchical religious bodies to establish their own internal rules and regulations and to create tribunals for adjudicating disputes over religious matters"); *see also* **Hawkins v. Trinity Baptist Church**, 30 S.W.3d 446, 452 (Tex. App.—Tyler 2000, no pet.) (emphasis added) ("First Amendment to the United States Constitution does not categorically insulate *religious relationships* from judicial scrutiny, for to do so would necessarily extend constitutional protection to the secular component of these relationships"); **St. Joseph Catholic Orphan Soc'y v. Edwards**, 449 S.W.3d 727, 739 (Ky. 2014) ("churches are not the only benefactors of ecclesiastical abstention … [a]ll religious organizations are entitled to protection under the First Amendment"). We cannot conclude that the ecclesiastical abstention doctrine is inapplicable solely because IBLP may not qualify as a traditional church.

The relevant question is whether it appears certain that resolution of RPIs' claims will require the trial court to address purely ecclesiastical questions. *See McRaney*, 966 F.3d at 349. In its mandamus petition, IBLP represents that its teachings and materials are based on scriptures from the Bible, none of which "advocate sexual abuse or any other form of sexual immorality." Accordingly, by its own admission, IBLP's teachings and materials do not advocate sexual abuse and consequently, the intentional tort of sexual assault that underlies the civil conspiracy claim is not rooted in religious belief. *See Sanders v. Casa View Baptist Church*, 134 F.3d 331, 338 (5th Cir. 1998) (minister not entitled to judgment as matter of law on First Amendment grounds where activities complained of by plaintiffs not part of religious beliefs and practices); *see also Hawkins*, 30 S.W.3d. at 452 (pastor's sexual exploitation of church secretary not protected by First Amendment or Texas Constitution). In determining whether IBLP committed civil conspiracy, Respondent need not and cannot address issues such as theological controversy, church discipline, ecclesiastical government, or conformity of IBLP members to the standard of morals required of them. *See Lubbock*, 624 S.W.3d at 508-09. RPIs' claim is at least capable of resolution via application of neutral principles of tort law to a civil-law controversy in which a purported religious entity happens to be involved. *See id*. at 514; *see also McRaney*, 966 F.3d at 349. Because it is not certain that resolution of RPIs' civil conspiracy claim will require the trial court to address purely ecclesiastical questions, dismissal under the ecclesiastical abstention doctrine is not warranted at this stage of the proceeding. *See McRaney*, 966 F.3d at 347, 351 (district court's dismissal of suit against NAMB under ecclesiastical abstention doctrine premature where not certain that resolution of claims would require court to interfere with matters of church government, faith, or doctrine).

Regarding Gothard, as set forth previously, RPIs' petition asserts numerous factual details regarding Relators' teachings. "[W]hile courts have the capacity to inquire into the sincerity of a person's beliefs, the First Amendment prohibits courts from determining the veracity of religious tenets." *Tilton*, 925 S.W.2d at 678. And the "imposition of tort liability for engaging in religious activity to which the church members adhere would have an unconstitutional 'chilling effect' by compelling the church to abandon core principles of its religious beliefs." *Pleasant Glade Assembly of God v. Schubert*, 264 S.W.3d 1, 10 (Tex. 2008). Nevertheless, constitutional protections do not extend to violations of social duties or subversive to good order. *See* TEX. CONST. art. I, § 6 interp. commentary (emphasis added); *Tilton*, 925

15

S.W.2d at 677. '[R]eligious practices that threaten the public's health, safety, or general welfare cannot be tolerated as protected religious belief." **Schubert**, 264 S.W.3d at 12. Religious practices promoting sexual assault would certainly qualify as threatening the health, safety, or general welfare of the public.

But in their response to the dismissal motions, RPIs acknowledged that while holding and publishing religious beliefs is constitutionally protected, their lawsuit alleges that Relators' actions, not their beliefs, caused injury. And in their mandamus response, RPIs acknowledge that their claim is based on conduct rather than religious beliefs. Specifically, Relators are accused of engaging in a conspiracy to promote and conceal sexual assault. *See generally* **Tilton**, 925 S.W.2d at 679-81 (noting that fraud claim (and civil conspiracy) based on concrete acts - personally reading, touching, and praying over plaintiffs' prayer requests – did not infringe upon constitutional rights, but claims based on representations of religious doctrine or belief could not be considered by factfinder). It is reasonable to assume that Gothard agrees with IBLP's position that its teachings are based on the Bible, which does not advocate sexual abuse. Because sexual assault is not part of Relators' belief system, we cannot definitively say, based on the record before us, that this is a situation in which religious beliefs are so intertwined with a tort claim so as to unconstitutionally burden Relators' rights and embroil the court in an assessment of those religious beliefs. *See generally* **Schubert**, 264 S.W.3d at 11 (because religious practice of "laying hands" and church beliefs about demons were so closely intertwined with tort claim, assessing emotional damages against Pleasant Glade for engaging in these religious practices would unconstitutionally burden church's right to free exercise and embroil Court in assessment of propriety of those beliefs).

Accordingly, for the above reasons, it appears RPIs' civil conspiracy claim can be resolved without resort to inquiry into religious doctrine; thus, for purposes of Rule 91a, RPIs' civil conspiracy cause of action is not subject to dismissal at this juncture. Whether, absent reliance on religious teachings, no civil conspiracy claim can be established, is a question for another day. *See generally* **Davis**, 2023 WL 3735115, at *2; *see also* **McRaney,** 966 F.3d at 350 (at early stage of litigation, it was not clear that determinations would require court to address purely ecclesiastical questions).

**Summation**

In these early stages of the litigation, we conclude that Relators were not entitled to dismissal of RPIs' civil conspiracy claim under Rule 91a. Thus, Respondent did not abuse his discretion in denying their motions to dismiss.[9]

## DISPOSITION

Having determined that Relators have not shown themselves entitled to mandamus relief, we ***deny*** the petitions for writ of mandamus.

Opinion February 22, 2024.
*Panel consisted of Worthen, C.J., Hoyle, J., and Neeley, J.*

---

[9] This Court expresses no opinion as to whether RPIs will ultimately prevail on their claim of civil conspiracy against Relators. *See **Davis**,* 2023 WL 3735115, at *7 ("HOAIC may have a remedy short of actual trial, but rule 91a is not it. If HOAIC believes the facts proffered in its letters and other documents to be preclusive of the relief the Davises seek, it has a procedural avenue available to accomplish that result," i.e., summary judgment).



# COURT OF APPEALS

# TWELFTH COURT OF APPEALS DISTRICT OF TEXAS

# ORDER

**FEBRUARY 22, 2024**

**NO. 12-23-00296-CV**

**WILLIAM W. GOTHARD, JR.**
Relator
V.

**HON. JERALD (DEAN) FOWLER II,**
Respondent

## ORIGINAL PROCEEDING

ON THIS DAY came to be heard the petition for writ of mandamus filed by William W. Gothard, Jr.; who is the relator in appellate cause number 12-23-00296-CV and the defendant in trial court cause number 354-23, pending on the docket of the 115th Judicial District Court of Upshur County, Texas. Said petition for writ of mandamus having been filed herein on November 22, 2023, and the same having been duly considered, because it is the opinion of this Court that the writ should not issue, it is therefore CONSIDERED, ADJUDGED and ORDERED that the said petition for writ of mandamus be, and the same is, hereby **denied**.

*Panel consisted of Worthen, C.J., Hoyle, J. and Neeley, J.*



# COURT OF APPEALS

# TWELFTH COURT OF APPEALS DISTRICT OF TEXAS

# ORDER

**FEBRUARY 22, 2024**

**NO. 12-23-00307-CV**

**INSTITUTE IN BASIC LIFE PIRNCIPLES, INC.**
Relator
V.

**HON. JERALD (DEAN) FOWLER II,**
Respondent

## ORIGINAL PROCEEDING

ON THIS DAY came to be heard the petition for writ of mandamus filed by Institute in Basic Life Principles, Inc. (IBLP); who is the relator in appellate cause number 12-23-00307-CV and the defendant in trial court cause number 354-23, pending on the docket of the 115th Judicial District Court of Upshur County, Texas. Said petition for writ of mandamus having been filed herein on December 8, 2023, and the same having been duly considered, because it is the opinion of this Court that the writ should not issue, it is therefore CONSIDERED, ADJUDGED and ORDERED that the said petition for writ of mandamus be, and the same is, hereby **denied**.

*Panel consisted of Worthen, C.J., Hoyle, J. and Neeley, J.*